**STATE of Missouri, Respondent,**

v.

**Joshua A. WOLF, Appellant.**

**No. WD 60277.**

Missouri Court of Appeals, Western District.

Oct. 29, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Dec. 24, 2002.

---

Stephen C. Wilson, Cape Girardeau, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Karen L. Kramer, Assistant Attorney General, Jefferson City, MO, for respondent.

Before ULRICH, P.J., and SPINDEN and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

Joshua A. Wolf appeals the judgment of his convictions, after a jury trial in the Circuit Court of Boone County, of murder in the first degree, § 565.020;[1] armed criminal action (ACA), § 571.015; and arson in the second degree, § 569.050. The appellant was sentenced to concurrent sentences in the Missouri Department of Corrections of life, without the possibility of parole, for first-degree murder; life for

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

ACA; and seven years for second-degree arson.

The appellant raises two points on appeal. In Point I, he claims that the trial court erred in overruling his pretrial motion to suppress his confession and any evidence resulting therefrom because his confession was obtained in violation of his Fifth Amendment right to remain silent. In Point II, he claims that the trial court erred in overruling his motion for a continuance, filed in conjunction with his motion for a mental examination to determine whether he suffered from a mental disease or defect at the time of the charged offenses, which would exclude him from responsibility for those alleged criminal acts, because it violated the implicit requirement of § 552.030, governing such mental examinations, "that a reasonable amount of time be permitted to have the examination performed."

We affirm.

### Facts

In the spring of 2000, the appellant was living in Columbus, Ohio, with his maternal grandparents, William and Carol Jean Lindley. He was sixteen years old at that time and had been living with his grandparents from the time that he was seven or eight years old. Late that spring, the appellant's grandmother took a job at Saint Francis Medical Center in Cape Girardeau County, Missouri. The appellant and his grandmother moved to Cape Girardeau County in April 2000, with the grandfather planning to join them in June following his retirement. The grandmother began her new job on May 1, 2000, and the appellant enrolled in the ninth grade at the public junior high school the following day.

On the morning of Saturday, May 6, 2000, the grandmother was at home talking with her sister on the telephone. During their conversation, the grandmother told her sister that the appellant wanted an all-terrain vehicle and a new stereo system, but that she was not going to buy them for him. In ending the conversation, the grandmother stated that she had to get off of the telephone because the appellant was upset with her. That afternoon, the grandmother called her brother. During their conversation, the grandmother informed her brother that the appellant was not going with her to pick up her husband from the airport the following week because the appellant was in a bad mood. Sometime during the two hours following that call, the appellant stood at the top of the stairway above the family room with a .22 rifle and fired one shot at his grandmother, striking her in the head as she sat in a chair watching television. The grandmother died immediately from the shot.

Immediately following the shooting, the appellant left the house in the grandmother's vehicle and drove to an automated teller machine (ATM), where he withdrew $350 from his grandmother's checking account. He used that money to purchase various pieces of stereo equipment from an electronics store. The next morning, he returned to the same ATM and withdrew an additional $300 from the grandmother's checking account, using that money to buy parts for the installation of a car stereo. The receipts for the parts that were purchased were found later in the grandmother's vehicle.

On Monday morning, May 8, 2000, the appellant went to school and informed the principal that that day was going to be his last day because he was moving back to Ohio. Shortly after 1:00 p.m. that afternoon, the appellant left school in his grandmother's vehicle and returned to their house. At 3:16 p.m., an emergency operator received a 911 call, which reported a

fire at the grandmother's residence. Emergency personnel soon arrived on the scene and found the appellant standing outside the house. Although the appellant did not appear to be injured, paramedics took him to Saint Francis Hospital as a precautionary measure. Firefighters from the Cape Girardeau Fire Department entered the house, and upon finding that the fire was primarily limited to the family room, extinguished it. The grandmother's body was found on the floor of the family room, with the lower half of her body badly burnt. A subsequent investigation by the Missouri Division of Fire Safety determined that the fire had been intentionally started, most likely with the use of a fire accelerant, such as gasoline.

Deputy Sheriff David Craig of the Cape Girardeau County Sheriff's Office was dispatched to the hospital to speak with the appellant about the fire. The appellant told Deputy Craig that he had been down in the basement playing pool when he heard a loud noise upstairs and began to smell smoke. The appellant then claimed that he called 911 and crawled up a stairwell leading to the garage. The appellant did not mention anything about his grandmother being inside the house during the fire. Deputy Craig collected the clothes the appellant had been wearing and took him from the hospital to the juvenile office. Later that night, the appellant was questioned by Lt. John Brown of the Cape Girardeau Police Department and Detective James Humphreys of the Jackson Police Department. At that time, the appellant recounted a story similar to that which he had told Deputy Craig earlier that evening.

The next morning, the appellant was again questioned by Lt. Brown. Also present during this interrogation were Detective Humphreys, the appellant's uncle, and a juvenile officer.[2] The juvenile officer read the appellant his *Miranda* rights, and after indicating that he understood these rights, the appellant agreed to waive his right to remain silent and answer questions from Lt. Brown. Upon questioning by Lt. Brown, the appellant initially denied killing his grandmother and trying to destroy evidence of the crime. However, upon further questioning, the appellant ultimately confessed to killing his grandmother and attempting to burn the house down.

A petition was filed in the Circuit Court of Cape Girardeau County, Juvenile Division, by the Juvenile Officer of Cape Girardeau County alleging acts by the appellant, which, if committed by an adult, would have constituted murder in the first degree, § 565.020; ACA, § 571.015; and second-degree arson, § 569.050. While under the jurisdiction of the juvenile court, the appellant underwent two psychological evaluations to determine whether he suffered from a mental disease or defect which would exclude him from responsibility for the charged offenses. Those evaluations resulted in both examining physicians concluding that the appellant did not know or appreciate the nature, quality and wrongfulness of his conduct at the time he committed the offenses. The juvenile officer subsequently filed a motion to dismiss the juvenile petition to allow prosecution of the appellant as an adult, which the juvenile court heard and sustained on June 23, 2000. On that same day, the State filed a complaint in the Circuit Court of Cape Girardeau County charging the appellant with the same three offenses with which he was charged in the juvenile division.

---

**2.** The appellant's grandfather was also in attendance, but he left the room once the interrogation began.

On June 27, 2000, the State filed a motion, pursuant to § 552.020 and § 552.030, requesting a mental examination of the appellant in order to determine whether he was competent to assist in his own defense and to determine whether he was suffering from a mental disease or defect at the time of the offenses excluding responsibility. In granting the State's motion, the circuit court ordered that the appellant submit to a mental exam to be performed at the Fulton State Hospital. The mental examination was subsequently conducted by Dr. Jerome Peters, a senior psychiatrist with the Missouri Department of Mental Health, who diagnosed the appellant as suffering from major depressive disorder and antisocial personality traits. However, in his report, filed in the circuit court on September 5, 2000, Dr. Peters concluded, *inter alia*, that the appellant understood the nature, quality, and wrongfulness of his conduct when he committed the offenses, and that he was competent to stand trial.

A preliminary hearing was conducted on October 16, 2000, and upon the court's finding that there was probable cause to believe that the appellant had committed the three alleged felonies, he was bound over to the circuit court. On October 26, 2000, the appellant was charged by information with murder in the first degree, § 565.020; ACA, § 571.015; and second-degree arson, § 569.050. On October 30, 2000, the appellant entered pleas of not guilty or, in the alternative, not guilty by reason of mental disease or defect, to each of the charges. The appellant filed a motion for change of venue in the circuit court on November 9, 2000. The motion was sustained, with the case being transferred to the Circuit Court of Boone County on November 13, 2000.

On March 29, 2001, the appellant filed a motion for another mental examination pursuant to § 552.030, along with a motion to continue the trial date from April 17, 2001. The appellant contended in his motion for continuance, *inter alia*, that the mental exam, if granted, could not reasonably be conducted before April 17, 2001, necessitating a continuance. The trial court took up and heard both of the appellant's motions on April 4, 2001. The court overruled the appellant's motion for continuance, but sustained his motion requesting a psychiatric exam, provided that the exam was completed prior to the date set for trial. Pursuant to the court's order, the appellant was examined by Dr. William Logan, a private psychiatrist chosen by the appellant, one week prior to the trial.

On the same date that the appellant filed his motions requesting a psychiatric exam and a continuance, he filed a motion to suppress all statements that he made to law enforcement officers and any incriminating evidence procured as a result of these statements. The motion was heard by the trial court on April 16, 2001, and was overruled the same day.

The appellant's jury trial commenced on April 17, 2001, and continued for four days. The appellant filed motions for judgment of acquittal at the close of the State's evidence and at the close of all the evidence, both of which were overruled by the trial court. The case was submitted to the jury on April 20, 2001, and following deliberation thereon, the jury returned guilty verdicts against the appellant on all three charged offenses.

On May 14, 2001, the appellant filed a motion for judgment of acquittal or, in the alternative, for a new trial. On July 2, 2001, the trial court overruled the appellant's motion and sentenced him to life imprisonment without the possibility of parole on his conviction for first-degree murder; life imprisonment on his conviction for ACA; and seven years imprisonment

on his conviction for second-degree arson. All three sentences were ordered to run concurrently.

This appeal follows.

## I.

In Point I, the appellant claims that the trial court erred in overruling his pretrial motion to suppress his confession and any evidence resulting therefrom because it was obtained in violation of his Fifth Amendment right to remain silent. Specifically, he claims that his confession was obtained illegally, requiring it and any evidence resulting therefrom to be excluded at trial pursuant to the exclusionary rule, in that he confessed only after Lt. Brown continued to interrogate him after he had informed him, in response to his prior questioning, that "that's my final statement," which constituted an unequivocal revocation of the prior waiver of his right to remain silent.

■ A ruling on a pretrial motion to suppress is interlocutory and as such preserves nothing for appeal. *State v. Shifkowski,* 57 S.W.3d 309, 316 (Mo.App.2001). To properly preserve the issue of the admissibility of the evidence sought to be suppressed, the evidence must be objected to at the time it is offered for admission at trial. *Id.* Accordingly, a point relied on attacking the trial court's ruling on a pretrial motion to suppress, without attacking the court's ruling admitting the evidence, is deficient in that it does not identify the actual ruling that is subject to challenge and, therefore, does not preserve the issue for appellate review. *Id.* However, the issue still may be reviewed, in our discretion, for plain error, under Rule 30.20.

■ In determining whether to exercise our discretion to review for plain error, we look to determine whether on the face of the claim substantial grounds exist for believing that the trial court committed a "plain" error, which resulted in manifest injustice or a miscarriage of justice. *State v. Dudley,* 51 S.W.3d 44, 53 (Mo.App.2001). "Plain" error for purposes of Rule 30.20 is error that is evident, obvious and clear. *State v. Hibler,* 21 S.W.3d 87, 96 (Mo.App. 2000). If the court exercises its discretion to conduct plain error review, the process involves two steps. First, the court must determine whether the trial court committed error, affecting substantial rights, that was evident, obvious and clear. *Id.* However, as in the case of regular error, not every plain error requires reversal. *State v. Carr,* 50 S.W.3d 848, 853 (Mo.App.2001). In the case of regular error, to be reversible, the error must have prejudiced the appellant. *State v. Taylor,* 67 S.W.3d 713, 715 (Mo.App.2002). Likewise, in the case of plain error, the error must have prejudiced the appellant, except that such prejudice must rise to the higher level of manifest injustice or a miscarriage of justice. *State v. Cole,* 71 S.W.3d 163, 170 (Mo. *banc* 2002). Thus, even if obvious and clear error is found, the second step in plain error review requires the appellate court to determine whether manifest injustice or a miscarriage of justice resulted therefrom. *Hibler,* 21 S.W.3d at 96.

■ As noted, *supra,* the appellant is claiming that his confession and any related evidence should have been suppressed, pursuant to the exclusionary rule, because it was obtained illegally in that he only confessed after he had revoked the prior waiver of his Fifth Amendment right to remain silent by stating "that's my final statement." The exclusionary rule requires the suppression of evidence obtained as the result of unlawful government conduct. *State v. Vinson,* 854 S.W.2d 615, 622 (Mo.App.1993). The rule applies to violations of the Fifth Amend-

ment, as well as the Sixth Amendment. *Id.*

■ In the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court required that a suspect taken into custody by a law enforcement officer must be informed that he or she has the right to remain silent, that anything that he or she says can be used against him or her, that he or she has the right to consult with an attorney before submitting to interrogation, and that if he or she cannot afford to hire an attorney, one will be appointed to represent him or her for free. *Id.* at 467–73, 86 S.Ct. at 1624–27, 16 L.Ed.2d at 720–23. Having been read his or her *Miranda* rights, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1627, 16 L.Ed.2d at 723. "A person has a right under the Fifth Amendment to 'cut off questioning' and this right must be scrupulously honored." *State v. Simmons*, 944 S.W.2d 165, 173 (Mo. banc 1997) (*citing Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975)). "The suspect, however, must give 'a clear, consistent expression of a desire to remain silent' in order to invoke his rights adequately and cut off questioning." *Id.* at 173–74 (*quoting U.S. v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989)). If a person subjected to custodial interrogation wishes to revoke his or her waiver of the right to remain silent, he or she is under an obligation to communicate this revocation in a clear and intelligible fashion. *State v. Tims*, 865 S.W.2d 881, 885 (Mo.App.1993). "A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation." *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994). We consider the defendant's statements as a whole in determining whether they indicate an unequivocal decision to invoke the right to remain silent. *U.S. v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995). When an accused party is subjected to further questioning after he or she has invoked his or her right to remain silent, resulting statements from the accused party shall be deemed inadmissible. *State v. Kelly*, 439 S.W.2d 487, 490 (Mo.1969); *State v. Wood*, 559 S.W.2d 268, 272 (Mo.App.1977).

There is no dispute that the appellant was read his *Miranda* rights prior to his interrogation by Lt. Brown on May 9, 2002, that he initially waived his right to remain silent, and that he agreed to answer questions by Lt. Brown. What is in dispute is whether he subsequently revoked his waiver and invoked his right to remain silent such that the questioning thereafter by Lt. Brown rendered the appellant's subsequent confession constitutionally infirm, requiring its suppression and the suppression of any related evidence. In contending that he revoked his initial waiver of his right to remain silent, the appellant relies on his statement to Lt. Brown, which was made prior to his confession and in response to Lt. Brown's repeated assertions that the appellant had killed his grandmother, that: "Did not and that's my final statement." In that regard, the record reflects the following exchange between the appellant and Lt. Brown:

Appellant: Listen. You can just cut this. I know what you're doing. Let's just get on with the questioning since you have all this evidence that's been proved. 'Cause you—

Lt. Brown: Okay, I'll ask you bluntly—

Appellant:—were the biggest jerk—

Lt. Brown:—why did you kill your grandmother?

Appellant: I didn't kill my grandmother.

Lt. Brown: Yes, you did.

Appellant: I did not.

Lt. Brown: Yes, you did.

Appellant: Did not and that's my final statement.

Lt. Brown: Why did you try to burn up the guns?

Appellant: I didn't try to burn up my guns.

Lt. Brown's questioning continued after this exchange, eventually resulting in the appellant's confession. The State contends that the appellant's statement that "that's my final statement" did not constitute a clear, unequivocal revocation of his prior waiver of his right to remain silent such that Lt. Brown's subsequent questioning did not violate the appellant's right to remain silent requiring suppression of his confession and the suppression of any related evidence. We agree.

The appellant's statement on which he relies to show that he revoked his waiver of his right to remain silent is ambiguous at best. While it is arguable that it could have been read as evincing an intent by the appellant to cut off all questioning by Lt. Brown, it could just as easily have been understood by a reasonable law enforcement officer, under the existing circumstances, as indicating that the appellant would not change his statement that he did not kill his grandmother. Lt. Brown testified at the suppression hearing that he did, in fact, interpret the appellant's statement to mean that he was not going to change his statement that he did not kill his grandmother. Considering the context in which the appellant's statement was made, with the appellant repeatedly being accused of murdering his grandmother, Lt. Brown's interpretation of the statement appears to be a reasonable one, such that on the face of the appellant's claim, we cannot say that it was error, much less plain error, for the trial court to overrule the appellant's motion to suppress his confession as being obtained in violation of his right to remain silent. As such, we decline plain error review.

Point denied.

## II.

■ In Point II, the appellant claims that the trial court erred in overruling his motion for a continuance, filed in conjunction with his motion for a mental examination to determine whether he suffered from a mental disease or defect at the time of the charged offenses, which would exclude him from responsibility for those alleged criminal acts, because it violated the implicit requirement of § 552.030, governing such mental examinations, "that a reasonable amount of time be permitted to have the examination performed." Specifically, he claims that the trial court, although granting his motion for another mental examination, erred in failing to also grant a continuance of his trial because in doing so, Dr. Logan, the psychiatrist conducting the examination, was prevented from conducting the complete and full examination contemplated by § 552.030.

Before we address the merits of the appellant's claim in this point, we first must address the State's contention that the appellant did not properly preserve his claim for appellate review. To properly preserve a claim of error for appellate review in a jury-tried criminal case, the error must be included in the appellant's motion for new trial. Rule 29.11(d); *State v. Markham*, 63 S.W.3d 701, 708 (Mo.App. 2002). The appellant did not include in his motion for new trial any allegation of error

with respect to the trial court's denial of his motion for continuance such that review by us, if any, would be limited to plain error, under Rule 30.20. Thus, applying the Rule 30.20 standard discussed, *supra*, we must first determine whether on the face of the appellant's claim substantial grounds exist for believing that the trial court committed a "plain" error which resulted in manifest injustice or a miscarriage of justice in failing to grant the appellant's motion for a continuance. *Dudley*, 51 S.W.3d at 53.

 A decision on whether to grant a continuance lies within the sound discretion of the trial court. *State v. Wolfe*, 13 S.W.3d 248, 261 (Mo.*banc*), *cert. denied*, 531 U.S. 845, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000). "Reversal is warranted only upon a very strong showing that the court abused its discretion and prejudice resulted." *State v. Christeson*, 50 S.W.3d 251, 261 (Mo. *banc* 2001) (*citing State v. Middleton*, 995 S.W.2d 443, 465 (Mo. *banc* 1999)). A court abuses its discretion when its ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* Thus, in the context of plain error review, we will reverse the trial court's denial of the appellant's motion for continuance only if we determine that its ruling was an obvious and clear abuse of discretion, which resulted in manifest injustice or miscarriage of justice to the appellant.

On its face, the appellant's claim fails to allege substantial grounds for believing that the trial court's failure to grant the appellant's motion for continuance resulted in manifest injustice or a miscarriage of justice. For manifest injustice or a miscarriage of justice to result from the trial court's failure to grant a continuance, the appellant would have to establish that had the continuance been granted, the results of the mental examination would have been different such that he would have been found not guilty of the charged offenses on the basis that he suffered from a mental disease or defect excluding him from responsibility. Thus, in order to be entitled to plain error review, he would have to allege in his claim of plain error how the failure to grant a continuance adversely affected the outcome of the mental examination. As the appellant's claim fails to make any such allegation, we decline plain error review.

Point denied.

### Conclusion

The judgment of the circuit court convicting the appellant of murder in the first degree, § 565.020; ACA, § 571.015; and arson in the second degree, § 569.050, is affirmed.

ULRICH, P.J., and SPINDEN, J., concur.